Filed 3/28/24  Nelson v. Offield CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| NANCY OFFIELD NELSON,<br>Plaintiff and Appellant,<br>v.<br>DIANE M. OFFIELD,<br>Defendant and Appellant. | A160134<br><br>(San Mateo County<br>Super. Ct.<br>No. PRO119451) |

This appeal is the latest—and, we hope, the last—chapter in the saga of the Estate of Archie and Olive Offield, who died in 2001 and 2009 respectively, at the ages of 87 and 92.  The saga began in December 2009, when Nancy Nelson, one of four Offield siblings, filed five probate petitions against her brother Duffy and her sister Martha.  A bench trial was held in 2013, with the last day of testimony in mid-October.  In March 2014, the trial court issued its proposed statement of decision, and in October 2018, its final statement of decision, a four-plus year delay nowhere explained in the record. It would be over another year until judgment was entered, specifically in December 2019, which judgment held for Nancy on some of her claims against Duffy, for Duffy on other of the claims against him, and for Martha on all the claims against her, exonerating her from liability.

1

Duffy filed an appeal, and Nancy a cross-appeal, between them asserting seven claims of error, in appellate briefs totaling over 400 pages with over 20,000 words.[1] So here we are, in 2024, over 14 years since Nancy filed her petitions, and neither Martha, who was completely exonerated, nor Joan, the fourth sibling who was never even a party—both of whom, we understand, are now in their late 70s, if not early 80s—has received anything from their parents' substantial estate. Something is very wrong here, and it is time that the saga be brought to an end. And that we do, concluding that neither Duffy's appeal nor Nancy's cross-appeal has merit, and affirming the judgment in its entirety.

## BACKGROUND

### The Offield Family

Olive Offield and Archie Offield, Sr. had four children: Martha Zarcone, Joan Stoneberg, Nancy Nelson, and Archie Offield, Jr. called Duffy.[2] Archie and Olive lived in Burlingame, where they raised their children, and where Archie owned an insurance business, which business was located in the Offield Building, a building so named because Archie's father had built it. Archie and his siblings inherited it, and Archie then bought out his siblings' shares. The Offield Building is listed as a Burlingame historical site.

### The Offield Estate Plan

In January 1983, Olive and Archie established the Offield Family Trust (Family Trust), a document prepared by the law firm of Carr McClellan, Ingersoll, Thompson & Horn P.C. (Carr McClellan) Under the terms of the

---

[1] Duffy died in 2021, at age 72, after the appeal was filed, and Diane Offield, the executrix of his estate, substituted in. For clarity and consistency with the briefing, we refer to the appeal as Duffy's.

[2] As is typical in family-based litigation, we refer to the parties by their first names.

Family Trust, the four Offield children were to inherit in equal shares. Dick raised the possibility of Archie gifting the building to Duffy. Archie replied that he did not want Duffy to have the building, and the children should share it equally.

In 1992, Archie and Olive executed a First Amendment to the Family Trust, which provided that upon the death of Archie or Olive, the assets would be divided into a Bypass Trust and a Survivor's Trust. The Bypass Trust was irrevocable and would receive the lesser of either (1) the deceased's interest in the Family Trust assets or (2) the largest amount that would not incur certain tax liabilities. Olive would be sole beneficiary under the Bypass Trust and the four children would be remainder beneficiaries in equal shares. The Survivor's Trust was revocable and would hold for the surviving spouse any assets that did not flow into the Bypass Trust. And while the surviving spouse could revoke or amend the Survivor's Trust, the First Amendment did not change the Offield children's inheritance in equal shares.

We digress briefly from the discussion of the trust documents to note that according to Nancy's testimony at trial sometime in the early to mid-1990s she was told by Martha that she suspected Duffy was stealing from Archie because Duffy was taking lavish vacations and living beyond his means. Nancy spoke with Duffy about this, but did not tell her parents because she thought Duffy would stop. Duffy denied the accusation, and a few weeks later, Martha denied having raised the issue with Nancy. After that Nancy and Duffy rarely spoke to each other.

The four Offield children had good individual relationships with Olive. But Nancy was estranged from Martha and Duffy, to the extent they would not speak or physically be near each other. Indeed, Nancy testified she was not invited to Olive's 90th birthday because her "family wouldn't talk to [her],

3

because [she's] evil." Nancy also testified that Olive knew there was a rift between Nancy and her siblings, but did not try to fix it. As a result, in most instances Nancy would see her mother separately from her siblings, with Olive visiting Nancy at homes she owned in Hawaii and Donner Lake.

In 1998 Archie and Olive executed the Second Amendment to the Family Trust, which amendment named Duffy and Martha successor trustees, with Nancy to be appointed if Duffy and Martha did not qualify or ceased to act. The amendment did not change that the Offield children would inherit equally.

As indicated, the Family Trust, as well as the amendments, had been prepared by attorneys at Carr McClellan, and in 2000 Steven Anderson of that firm took over the representation of the Offield estate plan, their prior attorney having retired.

### Duffy Becomes Involved in Handling Olive's Affairs and Acquires the Offield Building

In 1976, Duffy began working for Archie's insurance business.[3] And sometime in the 1980s, Duffy assumed management of the Offield Building, where he maintained an office.

In 1998, Duffy was given power of attorney over Olive, and in the early 2000s—Duffy said it was in 2004—he began balancing Olive's checkbook. Following Archie's death, Duffy became more involved in caring for his mother's day-to-day needs, such as taking her to doctor appointments, paying her bills, purchasing her groceries and prescription medications, and managing and paying her part-time caregivers. At trial Nancy acknowledged

---

[3] According to Duffy, in 1980 Archie gifted the insurance business to him.

that Duffy "took great care of" Olive, and that she was "very grateful that he was there to take care of Mom."

But while Nancy's testimony of Duffy's care for his mother might have been positive, as will be seen, most of the evidence about Duffy offered by Nancy was not.

In June 2005, Olive, Martha, and Duffy met with Mr. Anderson at the Carr McClellan offices to discuss Olive's estate plan. The meeting began with Mr. Anderson being told that Nancy was very wealthy and did not have a good relationship with Martha or Duffy. Mr. Anderson's notes of that meeting reflect that Olive discussed changing the Bypass Trust and the Survivor's Trust such that a non-pro rata allocation of "Bgame Ave" (i.e., the Offield Building) would go to Duffy upon her death so that he could own 100 percent of the building.

From that point on, there were a series of meetings, over a period of years, among Olive, Duffy, Mr. Anderson (and sometimes others) to discuss Duffy's acquiring ownership of the Offield Building. Those meetings were testified to at length at trial, and are the subject of much discussion in the briefs, especially Nancy's, which points to those meetings, and numerous documents pertinent to them, in support of her position, which testimony will be discussed in detail below in connection with the issue to which it pertains. Suffice to say here that two things occurred as a result of those meetings:

In December 2007, Olive signed a new will and the Third Amendment of the Survivor's Trust (the Third Amendment), which effectuated the transfer of the Survivor's Trusts interests in the Offield Building to Duffy *on Olive's death*—an amendment the trial court would uphold.

In March 2008, Olive and Duffy signed the paperwork that would effectuate the sale of the Offield Building to two newly created legal entities,

5

Offield Ventures, LP and Offield Management, LLC, the effect of which transferred ownership of the Offield building to Duffy *while Olive was alive—* transactions the trial court would rescind on the basis they were a result of undue influence by Duffy.

One last item of background that would factor into the trial court's analysis here was Olive's physical and mental condition. As early as 2001, Olive had been diagnosed with a form of leukemia and also with several heart issues, including hypertension, coronary artery disease, and atrial fibrillation. In early 2006, Olive complained of dizziness, and in July of that year she presented to the emergency room after Duffy noticed she was "goofy, wobbly, and disoriented" for about a week, mispronouncing words and behaving strangely. The emergency room doctor diagnosed Olive with acute disorientation, and the internist diagnosed her with "altered mental status," likely due to excess sodium.

In early 2007, Martha called Olive's doctor with concerns Olive was "declining" and asked if he would see her. After examining Olive, the doctor diagnosed her with "cognitive impairment."[4] Shortly thereafter, Duffy's wife called the medical advice hotline and reported that Olive was suffering from "agitation and restlessness and confusion," and that she was "disoriented" and had "slurred speech." The hotline provider diagnosed Olive with

---

[4] Martha would later write that after Olive was released from the hospital in January, she "declined RAPIDLY!" She was "lethargic, wanting to sleep most of the time, and not eating well." She "had trouble speaking, often not able to say the words though she tries and they just don't come out." Martha also reported Olive had "gotten VERY weak," had trouble getting out of a chair, and complained of general pain, describing her as "very weak when she tried to speak."

"confusion" and "delirium" and recommended she be seen by her doctor within four hours.

On April 4, Olive saw her doctor, who noted she suffered from "cognitive impairment." And at a May 22 visit, Olive's doctor again diagnosed her with "cognitive impairment" and as "unsteady on feet," but that her "memory was improving." A week later, Martha called Olive's doctor to advise Olive was "kind of out of it."

In January and February 2008, Olive's doctor noted that she suffered "memory impairment," and at a February 2009 appointment that she had "cognitive impairment."[5] In June, Olive was hospitalized for liver, kidney, and heart problems, and the doctors told Duffy she might not survive. Duffy decided to bring Olive home for hospice care, where she died a few weeks later.

**The Proceedings Below**

*The Pleadings*

In December 2009, Nancy filed five petitions in probate court, seeking (1) a declaration that the Third Amendment was invalid; (2) to remove Duffy as Trustee; (3) return of certain property to the Family Trust; (4) probate of Olive's 1992 will; and (5) a claim for elder abuse, fraud, and conversion, also seeking a constructive trust (the elder abuse petition).

---

[5] In February 2008, Martha's granddaughter interviewed Olive to complete a project called Hallmark Legacy Keeper, which project provides the interviewer questions to ask regarding family histories. Olive struggled with many questions, unsure of Archie's birthday, the day he proposed to her, when they married, or where they honeymooned. And when asked about the difficult times in her life or decisions she would change, she said she could not remember. At other points, Olive was nonresponsive.

In February 2010, Duffy and Martha filed responses to Nancy's petitions, denying all allegations of wrongdoing and asserting various affirmative defenses.

In July 2011, by order of the trial court (the Honorable George Miram), Duffy and Martha were suspended as co-trustees of the Family Trust and Michael J. Valencia was appointed interim trustee.

In March 2012, Nancy filed a motion seeking to add Martha as a respondent in the elder abuse petition, which Judge Miram granted.

In May, Nancy filed a motion seeking leave to add Carr McClellan and Mr. Anderson as respondents in the elder abuse petition, which motion was also granted by Judge Miram. Following that, Carr McClellan withdrew as counsel for Duffy and Martha, and the firm of Hassard Bonnington, LLP substituted in, and remains their counsel on appeal.

In December, Carr McClellan and Mr. Anderson settled Nancy's claims against them. And in January 2013, the interim trustee petitioned for an order approving the settlement. According to the petition, the claims against Carr McClellan and Mr. Anderson would be dismissed in exchange for payment of $2,000,000 to Nancy as "reimbursement for attorney's fees and expenses incurred by Nancy" and payment of $41,098 to the Offield Family Trust as "reimbursement of attorneys' fees and costs associated with the planning, drafting and execution of the amendments to the estate plan and the sale of the Offield Building. . . ." In January 2013, the trial court (the Honorable Joseph Scott) granted the petition. No good faith determination was sought.

*The Trial*

A bench trial before the Honorable Marie Weiner began in August, 2013, and proceeded for 25 trial days, the last of which was October 16.

8

Numerous witnesses testified and over 300 exhibits were introduced. Post-trial briefs were filed.

On March 17, 2014, the trial court issued a proposed statement of decision that said at some future point the court would issue "a more factually detailed amended proposed statement of decision" and that objections to the statement of decision would be determined "upon service of the amended proposed statement of decision."

On March 27, 2015, when more than a year had passed and no amended proposed statement of decision had been issued, Duffy and Martha filed a motion requesting leave to file objections to the proposed statement of decision.

On August 27, the trial court issued its amended proposed statement of decision.

In September, the parties filed objections to the amended proposed statement of decision. And on December 4, the court held a hearing on the parties' objections.

It would be almost three years later, specifically, October 3, 2018, when the court issued its final statement of decision.[6]

*The Final Statement of Decision*

The final statement of decision was a comprehensive 72 pages, which statement addressed all the issues before the trial court, many of which are

---

[6] As mentioned at the outset of this opinion, the reason(s) for the extraordinary delay in this case is not clear in the record. What we glean is that after August 27, 2015, the date of the amended proposed statement of decision, the trial court issued no fewer than nine case management orders, and the appellant's appendix reflects that over 1,000 pages of pleadings were filed. As to this latter point, we are not certain that the appellant's appendix contains all the filings, as a comparison of it and the 198-page register of actions indicates there could have been many other filings.

not involved in this appeal. The statement also addressed, at great length, the Third Amendment that would result in Duffy obtaining the Offield Building upon Olive's death, and the complicated transaction that resulted in Duffy acquiring the Offield Building while Olive was still alive. We thus discuss the evidence leading to these transactions in some detail.[7]

It begins, as noted, in June 2005, when Duffy and Martha took Olive to meet with Mr. Anderson to discuss Olive's estate plan. Among other things, Duffy indicated he wanted 100 percent of the Offield Building. Olive said that all the children should inherit equally. They also discussed a no contest clause, based on the concern that an unnamed child would challenge any changes to the estate plan.

Mr. Anderson followed up with a letter confirming Olive's desire that the children inherit equally and recommending how to proceed, recognizing Olive's desire to keep the Offield Building in the family. However, Mr. Anderson proposed creating a family limited partnership to own and manage the Offield Building that would facilitate sale of the property to Duffy, and avoid a partition action if someone challenged the transaction. Mr. Anderson also proposed a family installment sale in which the Offield Building was appraised, and then an undivided interest in the property transferred to Duffy in exchange for a promissory note secured by the property.

By November 2006, Duffy had called Mr. Anderson at least twice to discuss the family installment sale option. Meanwhile, Duffy pursued an appraisal for the Offield Building, and on April 16, 2007 advised Carr

---

[7] Much of this evidence is from the statement of decision, most of which is not challenged as unsupported by substantial evidence. We thus accept those facts, and determine whether they support the judgment. (*Rael v. Davis* (2008) 166 Cal.App.4th 1608, 1617.)

10

McClellan attorneys that he was looking to purchase the Offield Building for below $2 million—this, at a time when the building was appraised at $4.8 million.

On April 26, Duffy took Olive to meet with Mr. Anderson. Olive again expressed that she wanted a four-way distribution of the assets. They also discussed selling the Bypass Trust's 15.77 percent interest in the Offield Building to Duffy.

On April 30, Duffy left a voicemail message with Mr. Anderson's partner stating that Olive would sell Duffy the Bypass Trust's entire interest, plus a portion of the Survivor's Trust's interest in the Offield Building, for a total of 76 percent interest in the property. The sale terms included two promissory notes for 15 and 30 years at five percent interest, secured by the Offield Building.

In June 2007, Mr. Anderson sent Olive documents that included a Third Amendment to the Trust, along with a letter explaining the changes. The letter explained that although Olive could not change the Bypass Trust, she could sell its interest in the Offield Building, and the sale proceeds and promissory note would belong to the trust, and the children would inherit equally. If Olive sold the Survivor's Trust's interest in the Offield Building to Duffy, upon her death, Duffy would (1) receive the remaining Survivor's Trust interest to the extent it did not exceed his equal share of the trust fund, and (2) have the option to purchase that excess interest.

Olive did not respond for several months, so in September Mr. Anderson wrote a follow-up letter.

On October 4, Duffy and Martha (and her husband Paul) took Olive to meet with Mr. Anderson. Nancy and Joan were not present. Paul recorded the meeting, and a transcript of that meeting was introduced at trial and

11

discussed at length in the final statement of decision—and in terms devastating to Duffy.

Olive began discussing her wishes, but Duffy interjected to make sure she discussed the Offield Building. When Olive again attempted to state her wishes, Duffy insisted she read a typewritten note that, he said, Olive had typed that morning.[8] Reading the note, Olive said the Offield Building should go to Duffy, while the other children should receive the residence and securities. Duffy then asked about finalizing the sale of the Offield Building. Mr. Anderson suggested Olive could sell a portion of the Survivor's Trust's interest in the building, taking back a promissory note from Duffy, going on to explain that upon her death Olive could give the note back to Duffy, which would forgive Duffy's debt. Duffy liked that option because the financial impact on him would be less than his tax liabilities. Olive remained silent.

Mr. Anderson then discussed another option in which Duffy would purchase interests in the Offield Building from the Bypass and Survivor's Trusts totaling 50 percent and create a limited liability corporation with Olive into which they would "dump the property." Mr. Anderson explained this arrangement would allow Duffy to avoid a Proposition 13 reassessment and give him other advantages. But according to Mr. Anderson, Olive would have to give Duffy the rest of her interest in the Offield Building or the limited liability company, and it would reduce the value of the building, making it easier for Duffy to purchase it. Duffy replied, "it doesn't bother me

---

[8] Olive's typewriter was non-electric and weighed 15 pounds. At trial, Joan testified the typewriter was kept in the upstairs bedroom, testimony consistent with that Duffy gave at his deposition. However, at trial Duffy testified that Olive was unable to carry the typewriter downstairs where she supposedly typed, surmised that it was in a downstairs closet, and that one of Olive's home caretakers could have retrieved it. Olive's principal caregiver testified she never saw a typewriter.

that the value of the building would be going down[.]" Olive said nothing. Mr. Anderson continued, explaining to Duffy "we could create a family limited partnership after your purchase from her" and recommended Duffy purchase an amount of interest in the Offield Building that would avoid "a property tax reassessment when mom dies." Martha replied, "Yeah, that would be good," and Duffy echoed "It's all sounding better." Olive remained silent.

To avoid other estate taxes, Mr. Anderson recommended Duffy and Olive split ownership 51-49 before creating the family limited partnership. Duffy inquired how the partnership would end and how it would impact transferring the building to the children. After hearing Mr. Anderson's explanation, Duffy said "Okay, so that's what I want to do. Whatever it takes." He then quickly corrected himself, and said "That's what she wants to do."

Mr. Anderson explained Olive needed to affirm she wanted to be a limited partner with 49 percent ownership. Olive replied, however unresponsively, "Give me some money!" and laughed. Mr. Anderson explained Olive needed to say she wanted "to give [Duffy] 51 percent of what the building is worth." Duffy immediately interjected to make sure his 17 percent down payment was factored into the transaction. Mr. Anderson agreed.[9]

_____

[9] The only thing Olive expressed was confusion, as this portion of the transcript reveals:

"DUFFY: Less the 17 [percent].
"OLIVE: Hmmm? What did he say?
"MARTHA: Less the 17 [percent].
"DUFFY: Less that down payment. Okay?
"MR. ANDERSON: Okay. Done. That would certainly protect, minimize the value and protect the building in the long run.

Near the end of the meeting Mr. Anderson advised Olive he also represented Duffy, had a "technical conflict of interest," and Duffy would not be in the room when she returned to execute the documents. Duffy said he should have invited Nancy to the meeting, which he would later describe as sarcasm because he knew Nancy would object. Duffy asked Olive whether she was happy "with all of this." Olive replied simply, "Alright" and "I was born happy."

After the meeting Mr. Anderson emailed Carr McClellan colleagues Laurelle Gutierrez and Lisa Stalteri, advising that Olive had drastically changed her estate plan, going on to note that "the big fight here will come from evil rich sister when mom kicks."

In November, Mr. Anderson emailed Ms. Gutierrez again, reiterating that the estate "planning has evolved," and that he wanted to make sure the attorneys were on the same page, because Olive was "really unsophisticated and understands virtually nothing of what we send her." He also stated that "there is going to be a risk of WWIII when she dies because one of the three sisters hates everyone and is very rich." That same month Mr. Anderson sent the draft Third Amendment to Olive.

In early December, Duffy—not Olive—called Mr. Anderson and discussed finalizing Olive's estate documents. And on December 20, Duffy took Olive to meet Ms. Gutierrez to execute the changes to her estate plan. There, alone with Olive, Ms. Gutierrez reviewed the Third Amendment. She explained that Duffy would receive the entire Survivor's Trust interest in the Offield Building upon Olive's death, while the remainder of that Trust's assets would pass to the other three children. Olive remarked she wanted

---

"MARTHA: Great."

14

Copenhagen Bakery, one of the Offield Building's longstanding tenants, to remain, and if Duffy owned the property, he would charge the bakery below market rent so it could stay. Olive also stated that if any part of the Offield Building would pass to one of her children, the bakery would be forced out. Olive signed the Third Amendment that day.

Meanwhile, the Offield Building's value increased to $5.375 million. At the end of February 2008, Mr. Anderson sent Olive a letter advising of the appraisal's impact on a sale of that building to Duffy. A few days later, Duffy and Olive called Mr. Anderson. Duffy complained about the high purchase price and stated, "transfers within the family should be handled any way they want to."

On March 28, Duffy took Olive to see Mr. Anderson and finalize the documents and transactions that gave Duffy immediate ownership and control of the Offield Building, transactions the trial court described as "complicated and confusing." Specifically:

Duffy created an entity named Offield Management LLC, of which he was the sole member and operating agreement signator, and under which agreement Duffy owned 100 percent of the LLC. Its assets were one percent of the Offield Building, which Duffy alone contributed. Olive's name appeared nowhere in the articles of incorporation or the operating agreement.

A limited partnership called Offield Ventures LP was also formed. Offield Management was the General Partner, and the limited partners were the Survivor's Trust, through Olive as trustee, and Duffy individually. The interest in Offield Ventures was divided among Offield Management (one percent), the Survivor's Trust (49 percent), and Duffy (50 percent). Duffy maintained full control of Offield Ventures's bank accounts and funds

15

and had full management authority over the Offield Building via Offield Management.

Duffy then transferred his remaining 50 percent in the Offield Building to Offield Ventures. Olive executed a grant deed transferring the remaining 49 percent of the Survivor's Trust's interest in the building to Offield Ventures LP for no consideration.

Duffy purchased the Bypass Trust's 15.77 interest in the Offield Building for $626,000, consisting of a $126,000 down payment and a $500,000 promissory note at five percent interest secured by the property. Monthly payments were $3,954.51.

Duffy also purchased a 35.23 percent interest in the Offield Building from the Survivor's Trust. The price was $1.399 million, with a $280,000 down payment and a $1.119 million promissory note at five percent interest, secured by the property. Monthly payments were $6,012.69.

The upshot of these transactions was that Olive had transferred her entire ownership in the Offield Building to Duffy for a minority interest in Offield Ventures LP, which Duffy controlled.[10]

Describing all this, the trial court found Duffy was "not content to have achieved the right to inherit almost all of the Offield Building (over 88 [percent] with his share of the Bypass Trust)," and "was too anxious to wait for Olive to pass away." So, "Duffy decided he wanted to get ownership and control of the Offield Building now, and not have to wait for Olive to die."

_____

[10] The same day this occurred, Mr. Anderson presented Olive and Duffy with a letter explaining the potential for conflicts of interest due to Carr McClellan representing Olive, Duffy, Offield Ventures, LP, and Offield Management, LLC concurrently, and conflict waiver forms were signed by both Olive and Duffy.

16

At the same time, Duffy "wanted to work out a way to do so without having to pay the fair market value of the property, or make any substantial payment to the benefit of his sisters out of his own money."

With regard to "[t]he transactions and multitude of paperwork" in March 2008 that transferred the Offield Building to Duffy, the trial court noted they were "complicated and confusing—such that it would be difficult for Olive to understand." Not only that, the court said, "the evidence reflects that Duffy didn't understand them either—he just cared about getting control over the Offield Building and all of its revenues."

The trial court discussed the transcript of the October 4, 2007 meeting, noting that Mr. Anderson "did basically all of the talking" through "long, dry, complicated, technical soliloquies about estate taxes and potential avenues for structuring transactions mindful of tax implications, an[d] goes on monologs [*sic*] about LLCs, limited partnerships, general partnerships, percentages, loans, discounts, value, apportioning taxes, etc. etc." He "dominated the conversation," the court said, giving complicated explanations of tax liabilities. "Most of it," the court found, "is not understandable to a lay person" and "Olive's reactions" to it consisted of " 'Uh huh,' 'Um hum,' or laughing." The court further noted that "Olive didn't understand any of it," which, it added, "was the perception of Anderson as well." In short, the court found "there [was] no substantive indication that Olive knew or understood anything about a proposal to sell the Offield Building to Duffy right now and during Olive's lifetime."

The trial court further found that Olive's investment portfolio had diminished during the Great Recession, that "Olive's only income was the rent she received from the Offield Building," and thus "it made no sense" for Olive to transfer her ownership of the building and its revenue "in exchange

17

for a minority interest in a limited partnership" that "was utterly controlled by Duffy." The court summed it up this way: "Although Olive did sign the paperwork in March 2008 to sell 51 [percent] interest in the Offield Building during her lifetime, it was a highly complicated transaction that neither Duffy nor Olive understood at all. Indeed, all corporate formalities were ignored by Duffy and Olive. Instead, Duffy acted as though he were the owner of the Offield Building and entitled to all of its revenue. Duffy syphoned [*sic*] off all [the] revenue, leaving little to no 'profit' to be distributed to Olive as income for her 49 [percent] share. The creation and existence of Offield Ventures and Offield Management was a sham transaction, given Duffy's completely incongruous conduct thereafter."

The trial court's analysis included a detailed discussion of Olive's physical and cognitive problems, particularly in the last two years of her life, describing how "Olive's mental and physical health w[ere] diminishing" and she "was now utterly dependent upon Duffy to take care of her and her needs and finances." And the court concluded, Duffy "exercised undue influence upon his mother" regarding the inter vivos transfer of the Offield Building "facilitated by her diminished cognitive ability, advanced age, failing health, and her faith and trust in her son." Noting what it called Duffy's "rampant and escalating plunder of Olive's assets—especially the bank accounts and brokerage account"—the court concluded with this: "[n]ot content to take the key assets of the estate, namely the Offield Building, Duffy diverted Olive's existing funds to his own benefit (and her financial detriment), and thereby also depleting those assets that Olive intended to be inherited by her three daughters as their share of the estate."

The trial court also found that "Duffy started writing checks from his mother's bank account to himself."[11] As the court put it: "What resulted was the absurd farce of Duffy taking money from Olive's personal bank accounts and Olive's income, and using those funds to pay Olive the money that Duffy owed her on the promissory notes. To repeat: Duffy took Olive's money and used Olive's money to pay debts he owed to Olive."

The trial court also discussed Duffy's creation of a secret joint bank account through which he "siphon[ed] off Olive's money from other accounts and place[d] it under the control of Duffy in secret." The specifics of this were that in April 2007 Duffy opened a joint checking account with Olive under a number ending in 1323. But despite its joint nature, Duffy was the only signator on the account and received statements at his home address—despite that the checks had only Olive's name and address. The checks in account 1323 looked exactly like the ones from Olive's longstanding personal checking account (ending in 1669) with the same bank. This allowed Duffy to drain Olive's 1669 account by writing checks to Olive from that account, and then endorsing and depositing them in the 1323 account, a scheme, for example, that allowed Duffy to siphon $87,000 from the 1669 account in 2008. Duffy also deposited Olive's social security benefits into the 1323 account.

The trial court also discussed transactions through which "Duffy had Olive deplete the [UBS] investment account—which was for the inheritance of his sisters—for his benefit." The court also explained how Duffy took money from Olive's personal and Bypass Trust accounts, transferred the

---

[11] Though Duffy and his spouse had some income from other sources, the court noted "they relied predominantly upon getting money from Olive," with Duffy's monthly deposits from 2004 to 2007 averaging $10,000 and in 2008 increasing to $25,000.

19

funds to the Offield Ventures account, and then used it "to enhance the value of the building that was his sole inheritance" and to pay himself "draws." The trial court criticized Duffy's management fees despite his "basically non-existen[t] 'management' of the Offield Building." And it found Duffy had "converted" "$200,000 of Olive's personal funds" "into a loan to Martha Company, being of no benefit to Olive at all," and also "taking liquid assets which would never be inherited by Duffy (because they would all go to his sisters under the terms of the Third Amendment) and using them for his long-term benefit (as shareholder in Martha Company)." And as to all this, the court found, "Olive did not exercise knowing and independent control over her bank accounts and disbursement of funds"—including the alleged "delegation to Duffy to receive and give to Olive all of the rent revenue from the Offield Building."

The trial court not only found that these transactions were the result of Duffy's undue influence, but also found Duffy liable for financial elder abuse under Welfare and Institutions Code sections 15600 et seq. Nancy had proven by clear and convincing evidence that (1) Duffy committed bad faith financial abuse against Olive by fraudulently taking her "non-real estate assets such as cash and investments" and (2) "Olive was substantially unable to manage her financial resources or to resist undue influence at the time of these acts until her death."

*Proceedings After the Final Statement of Decision*

As indicated above, the trial court set numerous post-trial hearings. Several briefs addressing various issues followed, including as to calculation of damages and interest, and also on Duffy's belated claim that he was entitled to a credit under Code of Civil Procedure section 877 for the settlement with Carr McClellan. Following several additional submissions

20

regarding the calculation of damages and other issues, on December 31, 2019, the court issued its judgment.

Nancy moved for a new trial, and Duffy for a new trial, for vacatur of the judgment and entry of a different judgment, and to correct clerical errors. In March 2020, the trial court denied Duffy's motions. As to Nancy's motion, in lieu of granting a new trial, the court vacated and set aside (1) the judgment and (2) the portion of the final statement of decision that declined to award double damages under Probate Code section 859.

Duffy filed a notice of appeal, and Nancy a notice of cross-appeal.

In July 2020, the trial court issued amendments to final statement of decision and amendments to decision on judgment calculations.

Nancy moved for $2,996,840 in attorney fees, seeking fees incurred from early 2013 forward, asserting that the settlement with Carr McClellan had been applied to cover her fees before that time. The trial court ultimately awarded Nancy $640,890 in fees.

## DISCUSSION

## DUFFY'S APPEAL

### Duffy Demonstrates No Error in the Trial Court Imposing a Presumption of Undue Influence as to the Inter Vivos Sale of the Interests in the Offield Building.

The final statement of decision held that Duffy's inter vivos acquisition of the Offield Building resulted from his undue influence. Doing so, the trial court first held that "under the circumstances, Duffy has the burden of overcoming the presumption of undue influence over Olive's sale of her interests (directly or through her trusts) in the Offield Building," a burden shifted to Duffy because he had a confidential and fiduciary relationship with Olive, and the transfer of Olive's 49 percent interest to Offield Ventures was made for inadequate consideration.

21

Duffy's first argument is that the trial court erred in imposing on him a presumption of undue influence, asserting that the trial court did not follow the law set forth in the case it relied on, *Estate of Young* (2008) 160 Cal.App.4th 62, 79 (*Young*), specifically that the court disregarded *Young*'s requirements that such inter vivos transaction must be "without consideration" and without "independent advice."

We reject the argument. Before discussing why, we begin with the law of undue influence.

Undue influence is defined by both statute and common law. As to the former, section 86 of the Probate Code defines it as "excessive persuasion that causes another person to act or refrain from acting by overcoming that person's free will and results in inequity." (Welf. & Inst. Code, § 15610.70, subd. (a) [same].) In determining whether a result was produced by undue influence, a court must consider the vulnerability of the victim, the influencer's apparent authority, the actions or tactics used by the influencer, and the equity of the result. (*Ibid.*; Prob. Code, § 86.) The statutory framework is intended to "supplement the common law meaning of undue influence without superseding or interfering with the operation of that law." (Prob. Code, § 86.)

Under the common law, undue influence is described as "pressure brought to bear directly on the testamentary act, sufficient to overcome the testator's free will, amounting in effect to coercion destroying the testator's free agency." (*Rice v. Clark* (2002) 28 Cal.4th 89, 96; accord *In re Estate of Stoddart* (1917) 174 Cal. 606, 612.) As the leading commentary describes it, citing numerous cases: "Undue influence may be proved by showing: (a) the existence of a confidential relationship between the testator and the individual alleged to have unduly influenced the testator; (b) a propensity on

22

the testator's part—whether by reason of old age, mental infirmity or otherwise—to have their free will usurped by the individual exercising undue influence; and (c) the execution of a testamentary document 'unduly benefitting' the person alleged to have influenced the testator.  [Citations.]" (Ross et al., Cal. Practice Guide:  Probate (The Rutter Group 2023) ¶ 15:153.)[12]

In certain situations a presumption of undue influence can arise, which situations include when that parties are in a confidential relationship or the beneficiary of the transaction is a close personal relative.  " '[A] confidential relationship exists when one party gains the confidence of the other and purports to act with the other's interest in mind; it may exist although there is no fiduciary relationship; it is particularly likely to exist when there is a family relationship or one of friendship.' " (*Estate of Sanders* (1985) 40 Cal.3d 607, 615.)  If the presumption applies, the person against whom it runs must show by a preponderance of the evidence that the transaction was freely made, without the exertion of undue influence.  (*Bernard v. Foley* (2006) 39 Cal.4th 794, 800; *Estate of Graves* (1927) 202 Cal. 258, 262–263.)

In *Estate of Stephens*, *supra*, 28 Cal.4th 665, cited in *Young*, our Supreme Court set out the law of undue influence in an inter vivos situation: "In an undue influence case, for example, '[w]here the relationship between the parties is that of parent and child and the parent relies on the child for advice in business matters, a gift *inter vivos* . . . which is without consideration and where the parent does not have independent advice, is

---

12  While most of the cases and authorities talk in terms of testamentary acts, undue influence can exist in inter vivos transactions as well.  (See *Estate of Stephens* (2002) 28 Cal.4th 665, 676; *Young, supra,* 160 Cal.App.4th at p. 79.)

presumed to be fraudulent and to have been made under undue influence.' [Citation.] The burden of proof then shifts to the child 'to show that the transaction was free from fraud and undue influence, and in all particulars fair.' [Citation.] Put differently, this presumption may be rebutted by 'evidence that the act in question had its genesis in the mind of the parent and that he was not goaded to a completion by any act of such child.' [Citation.]" (*Estate of Stephens*, *supra*, 28 Cal.4th at p. 677.)

Duffy argues that the trial court ignored the "without consideration and where the parent does not have independent advice." He is wrong on both counts.

At several places in the statement of decision the trial court referred to "consideration," but only in a way indicating it was inadequate. As indeed it was. For example, Duffy asserts that he made down payments and executed promissory notes to Olive in order to acquire 51 percent of the Offield Building, and that he never missed a loan payment. But this ignores that Olive transferred her remaining 49 percent interest to Offield Ventures— thus giving him 100 percent control of the Offield Building—for no consideration. He also ignores the fact that he paid Olive only a fraction of the rents to which she was entitled for her transfer of the 49 percent interest. And Duffy's claim about never missing a loan payment is, in the words of the trial court, "an absurd farce," because he used Olive's money to make those payments—a fact Duffy does not dispute on appeal.

Duffy also contends the trial court ignored evidence of Carr McClellan's involvement in the inter vivos transfer. He argues this was error because "when independent legal advice is provided, the likelihood of undue influence is decreased as the transferor is informed of the legal consequences of their

24

actions." Maybe so, if the advice is truly independent, which is hardly the situation here.

As noted, Carr McClellan had at best a conflict-of-interest, as Mr. Anderson himself recognized, obtaining a waiver. Put otherwise, the firm's "advice" was hardly for Olive's benefit, as perhaps best demonstrated by the fact that Carr McClellan reimbursed over $41,000 in fees it had charged for its services.

Further, and as the trial court observed, the "transaction and multitude of paperwork" involved with the inter vivos transfer was "complicated and confusing—such that it would be difficult for Olive to understand." And specifically referencing the transcript of the October 4, 2007 meeting, the court found "there is no substantive indication that Olive knew or understood anything about a proposal to sell the Offield Building to Duffy right now and during Olive's lifetime." Indeed, as Mr. Anderson himself wrote, Olive was "really unsophisticated and understands virtually nothing of what we send to her." So much for "independent legal advice."

Duffy points to the finding that Olive understood an unequal distribution of the estate would result from her changes to the estate plan. But the trial court made that finding in upholding the Third Amendment. It has no bearing on whether Olive understood the inter vivos transfer, in regard to which the trial court found that "Olive didn't understand[] any of it."

But even if the trial court erred in shifting the burden of proof to Duffy, any error was harmless. "[A]rticle VI, section 13 [of the California Constitution] generally 'prohibits a reviewing court from setting aside a judgment due to trial court error unless it finds the error prejudicial.' " (*People v. Chun* (2009) 45 Cal.4th 1172, 1201; accord, *TriCoast Builders,*

*Inc. v. Fonnegra* (2024) 15 Cal.5th 766, 786; *F.P. v. Monier* (2017) 3 Cal.5th 1099, 1108.)  This rule of prejudicial error applies when the error claimed is a misallocation of the burden of proof.  (*In re Marriage of Burkle* (2006) 139 Cal.App.4th 712, 738 ["error in allocating the burden of proof must be prejudicial in order to constitute reversible error"].)

Duffy bears the burden of showing such prejudice (*Citizens for Open Government v. City of Lodi* (2012) 205 Cal.App.4th 296, 308), a burden that requires him to show "it is reasonably probable that a result more favorable to [him] would have been reached in the absence of the error." (*Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 800.)  This, he has not done, as the evidence was overwhelming that, in the court's words, Duffy "exercised undue influence over Olive Offield in regard to the transfer of [her] assets of the Trusts and of her personally during her lifetime, facilitated by her diminished cognitive ability, advanced age, failing health, and her faith and trust in her son."  At the time of the inter vivos transfer, Olive was 91 years old and in failing health.  She had been hospitalized on numerous occasions for dizziness, confusion, and disorientation, and on numerous occasions, over several years, diagnosed by her doctors as suffering from cognitive impairment.

At the same time—and as Duffy admits—he shared a confidential relationship with Olive managing her financial affairs and the Offield Building on Olive's behalf while she owned it.  Moreover, Duffy misused Carr McClellan, whom he repeatedly called—sometimes with Olive, mostly without—to discuss the transactions, and to set up meetings with them.  And as the transcript of the October 4, 2007 meeting shows, Olive lacked understanding of the inter vivos transfer, not in its broad terms, let alone its intricacies.

Were all that not enough, Duffy's conduct after the inter vivos transfer reinforces that it was, in the trial court's words, a "sham." Even though Olive was a 49 percent minority partner in Offield Ventures, Duffy admittedly never distributed any revenue from the Offield Building through Offield Ventures. Instead, Duffy pocketed the rent and only sporadically wrote Olive checks that fell well short of what she was owed. On top of that, Duffy siphoned Olive's cash and checking accounts into his own personal accounts, and used her funds to pay back the loans he took from her.

**Duffy Demonstrates No Error on Damages or Interest**

Duffy's second argument is that the trial court erred in calculating damages and prejudgment interest, an argument that includes four sub-parts: (1) ordering him to pay $150,000 he never received; (2) that in "unwinding" his purchase of the fractional shares of the Offield Building, failing to restore the parties to their positions prior to the transactions; (3) failing to give him credits to which he was entitled; and (4) calculating prejudgment interest.

By way of brief background, the trial court rescinded the March 2008 sale of the Offield Building and the transfer of assets to Offield Ventures and Offield Management, and as a result ordered the distribution of the Offield Building as an asset of both the Survivor's Trust and Bypass Trusts to proceed "as though no sale or transfer" of their respective interests occurred. This meant the Survivor's Trust was entitled to 84.23 percent of the rent and other revenue from 2008 forward, the Bypass Trust entitled to 15.77 percent, and all debt on the Offield Building allocated 100 percent to Duffy. The trial court also ordered Duffy to pay restitution for seven items: (a) the fair value of his office rent, (b) his car purchase, (c) monetary draws starting April 1, 2008, (d) funds Olive transferred to Offield Ventures, (e) funds taken from

27

Olive's bank accounts via cash or checks to Duffy, (f) checks made out to Olive but deposited in the joint account, and (g) gift distributions to Duffy from the UBS account in 2009. The trial court made clear that the effect of its ruling was to restore the parties to their respective positions as if the Third Amendment was valid, but the inter vivos transfer of the Offield Building to Duffy was not.

The first three sub-parts in Duffy's arguments are connected, essentially contending that the trial court's rescission award was error, as it did not completely restore him to the position he otherwise would have enjoyed had he not obtained the Offield Building from Olive. As he describes the argument in his reply brief: "[t]he fundamental problem with the court's erroneous approach, is that it failed to follow the mandates governing rescission remedies, where the party who paid money for property receives that money back, and the party that sold property for money receives the property back. Although the court claims the payments Duffy made on the S[urvivor's] T[rust] and B[ypass] T[rust] notes from the date of the purchase through the appointment of the interim trustee were from Olive's bank accounts or rent he improperly took for personal use, that claim has no bearing on how a rescission remedy must be implemented."

The argument reflects a misunderstanding of the law of rescission.

*Runyan v. Pacific Air Industries, Inc.* (1970) 2 Cal.3d 304 (*Runyan*) has an exhaustive discussion of the law of rescission, including its development since 1961 changes in the Civil Code (*Runyan*, at pp. 310–311), and the numerous cases applying the law, and went on to affirm a judgment determining that a contract had been rescinded and ordering restitution and consequential damages. Doing so, the Supreme Court said this: "The fundamental principle underlying these decisions and the awards which they

28

upheld is that 'in such actions the court should do complete equity between the parties' and to that end 'may grant any monetary relief necessary' to do so. (*Stewart v. Crowley* [(1931)] 213 Cal. 694, 701.) It is the purpose of rescission 'to restore both parties to their former position as far as possible' (*Bank of America v. Greenbach* [(1950)] 98 Cal.App.2d 220, 238, citing 3 Pomeroy, Equity Jurisdiction (5th ed.) 578) and 'to bring about substantial justice by adjusting the equities between the parties' despite the fact that 'the status quo cannot be exactly reproduced.' (*Lobdell v. Miller* [(1952)] 114 Cal.App.2d 328, 344; see also *Utemark v. Samuel* [1953] 118 Cal.App.2d 313, 317.) As the court said in *Greenbach* 'concurrent with the award of rescission, the trial court may award money damages or order such other relief as justice may require.' (98 Cal.App.2d at p. 238.)" (*Runyan*, *supra*, 2 Cal.3d at p. 316.)

Although the purpose of rescission "is to restore both parties to their former position as far as possible," exactitude is not required. Rather, courts should "bring about substantial justice by adjusting the equities between the parties despite the fact that the status quo cannot be exactly reproduced." (*Lobdell v. Miller*, *supra*, 225 Cal.App.2d at p. 344 ["No matter what may be the complications or complexities, the powers of a court of equity are so broad as to adequately meet the exigencies of the case and render a decree which will justly determine the rights of the respective parties"].)

Particularly apt here is the rule we applied over 60 years ago, in *Farina v. Bevilacqua* (1961) 192 Cal.App.2d 681, 685 (*Farina*), where we observed that when rescission results from the defendant's misconduct, courts " 'are not so much concerned with decreeing that defendant receive back the identical property with which he parted . . . as they are in declaring that his nefarious practices shall result in no damage to the plaintiff.'

29

[Citation.]"  In sum and in short, " ' "concurrent with the award of rescission, the trial court may award money damages or order such other relief as justice may require." ' " (*Neptune Society Corp. v. Longanecker* (1987) 194 Cal.App.3d 1233, 1246, quoting *Runyan, supra,* 2 Cal.3d at p. 316; see Civ. Code, § 1692.)

Duffy asserts that the standard of review on this claim is substantial evidence.  Duffy is wrong.  Rescission is an exercise of the trial court's equitable powers, and thus our review is abuse of discretion, as we recently confirmed in *Husain v. California Pacific Bank* (2021) 61 Cal.App.5th 717, 727 to 728 where, quoting our Division Four colleagues in *Richardson v. Franc* (2015) 233 Cal.App.4th 744, 751, we said:  " 'After the trial court has exercised its equitable powers, the appellate court reviews the judgment under the abuse of discretion standard.  [Citation.]  "Under that standard, we resolve all evidentiary conflicts in favor of the judgment and determine whether the trial court's decision ' "falls within the permissible range of options set by the legal criteria." ' " ' "

As to what is required for Duffy to show an abuse of discretion, it has been described in terms of a decision that "exceeds the bounds of reason" (*People v. Beames* (2007) 40 Cal.4th 907, 920) or one that is "arbitrary, capricious, patently absurd, or even whimsical." (*Artus v. Gramercy Towers Condominium Assn.* (2022) 76 Cal.App.5th 1043, 1051.)  As our Supreme Court has put it, "[a] ruling that constitutes an abuse of discretion has been described as one that is 'so irrational or arbitrary that no reasonable person could agree with it.' " (*Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 773.)  That hardly describes the ruling here—and Duffy has demonstrated no abuse.

The trial court found that before the appointment of the interim trustee, Duffy used the money he took from Olive to meet his monthly payment obligations on the promissory notes—and thus forfeited any credit from those payments. As the court put it: "Duffy is *not* receiving the return of any of his monthly payment of principal and interest on the promissory note, *prior to the appointment of the Interim Trustee*, as the evidence reflects that those funds actually came from Duffy's conversion of Olive's bank accounts and/or taking of rent revenue for his personal use (as improper 'draws' or 'fees'). As all of those monthly payments on the note were using Olive's money to pay the debt owed Olive, Duffy receives no monetary credit in the rescission of the transactions (other than his down payment)." Or as the court reiterated in the judgment: "As stated in the Final Statement of Decision, none of the payments made by [Duffy] actually came out of his own pocket and industry—but rather were funds he took that actually belonged to Olive and the Trusts."

Although the court attempted to protect Duffy from double-reimbursement, it explained that Duffy's own misconduct made that impossible, and that he bore the consequences, noting as follows: "Although the Court has attempted to avoid double-counting, unfortunately the parties have been unable to agree as to most of the damages calculations, making the determination conflicting. The problem is caused by [Duffy's] continuing pattern of shifting and diverting funds, and creating of multiple bank accounts to do so—making tracing of funds difficult. Thus any ultimate duplication of damages is caused by the conduct of [Duffy] and thus the consequences are borne by him."

Duffy contends that his misdeeds should play no role in the rescission holding, and that he is "being forced to repay the Trusts twice" for the

amounts he stole. The first is wrong as a matter of law. (See *Arthur v. Graham* (1923) 64 Cal.App. 608, 612 ["as a result of the rescission by the court, nothing is exacted from the plaintiff out of particular regard for the condition of the defendant. If his fraudulent acts have resulted in disastrous financial consequences to himself, it is no one's fault but his own, and he must sustain the necessary inconveniences thereby entailed"]; to the same effect, see *Farina, supra*, 192 Cal.App.2d at p. 685.)

The second is wrong as a matter of fact: Duffy cannot "double-pay" anything when his first "payments" consisted of money that, as the trial court found, was not his, but money taken from Olive to repay Olive.

Duffy's last sub-argument is that in calculating the pre-judgment interest he owed the Survivor's Trust, the trial court failed to credit him for sums over which the Survivor's Trust held "dominion and control" but that belonged to Duffy during the prejudgment interest period, specifically for: (1) his down payment, (2) promissory note payments made before and after the interim trustee's appointment, and (3) his claimed share of net rents the interim trustee has been collecting. Factoring in these sums, Duffy says, the Survivor's Trust owes him roughly $272,000 in prejudgment interest.

"Prejudgment interest . . . is a creation of statute designed to compensate for the presumed harm caused by the inevitable delays inherent in litigation. . . . Thus, the purpose of prejudgment interest is to compensate plaintiff for the loss of use of his or her property." (*Union Pacific Railroad Co. v. Santa Fe Pacific Pipelines, Inc.* (2014) 231 Cal.App.4th 134, 198, internal quotations and citation omitted.) That said, "if, during any prejudgment period, a party has dominion and control over money that is awarded to it as damages, it is not entitled to prejudgment interest for that

32

period." (*Greg Opinski Construction, Inc. v. City of Oakdale* (2011) 199 Cal.App.4th 1107, 1119.)

Duffy's argument fails because his payments are not "money awarded to" the Survivor's Trust as damages. On the contrary, except for the note payments Duffy made before the interim trustee was appointed, Duffy will be receiving those amounts back under the rescission award. So, what Duffy really argues is he is entitled to prejudgment interest on amounts paid to the Survivor's Trust that will be returned to him, a view that turns the prejudgment interest rule on its head.

Finally on this issue, we note that Duffy fails to mention that the trial court credited him for the amounts he claims. The parties contested prejudgment interest on amounts "pertaining to the unwinding of the Offield Building transactions," and Duffy sought credit for the same three categories of funds he attacks on appeal. The court declined to award prejudgment interest on any amounts arising from rescission, finding it was "a wash"—i.e., it was "not awarding prejudgment interest on these calculations which offset each other."

### The Award of Statutory Damages Under Probate Code Section 859 Was Not Error

Duffy's third argument is that the trial court erred in awarding statutory damages pursuant to Probate Code section 859, which provides in relevant part as follows: "If a court finds that a person has in bad faith wrongfully taken, concealed, or disposed of property belonging to . . . an elder, a dependent adult, a trust, or the estate of a decedent, or has taken, concealed, or disposed of the property by the use of undue influence in bad faith or through the commission of elder or dependent adult financial abuse, as defined in Section 15610.30 of the Welfare and Institutions Code, the

person shall be liable for twice the value of the property recovered by an action under this part."[13]

The trial court found that "certain aspects" of Duffy's misconduct during the inter vivos transfer of the Offield Building were so "egregious" as to constitute "bad faith" and that he was liable for double the amount of property he had taken. The trial court explained that Duffy "used undue influence to obtain 15.77 percent ownership of the Offield Building from the Bypass Trust, including but not limited to, structuring transactions to 'buy' the property for far less than fair market value to an uncreditworthy purchaser." And the court continued, "The promissory note held by the Bypass Trust was basically non-collectible" due to Duffy's poor finances and "the transfer of the 15.77 percent ownership interest to a sham limited partnership." "In addition," he "purloined" the net rents "that should have gone to the Bypass Trust" and by extension to Olive for use during her life and then to Duffy's siblings as Bypass Trust beneficiaries. All this, the court found, was "egregious and in bad faith."

The court determined the Bypass Trust's ownership interest was $822,011, or 15.77 percent of the appraised value of the Offield Building; that Trust also was deprived of $135,556 in lost rents. However, Duffy was entitled to offset his own down payment and any payments he made on the promissory note *after* the interim trustee was appointed. All told, the statutory penalty for Duffy's bad faith against the Bypass Trust was $1,259,774.

---

[13] From 2008, when Duffy acquired the Offield Building, to 2020, when the trial court analyzed the statute, Probate Code section 859 was amended twice, in 2011 and 2013. The trial court held the 2013 version governed, but the result would be the same even if the 2008 version controlled.

With regard to the Survivor's Trust, the trial court explained that but for the improper inter vivos transfer, "Olive, as the life beneficiary of the Survivor's Trust, would have received 84.23 percent of the net rent from leasing of the Offield Building," which would have been her "only source of income" at the time. Moreover, even after the initial 2007 sale of the Survivor's Trust's 35.23 percent interest, "Olive was still entitled to 49 percent of the rents—but [Duffy] had that ownership interest transferred away for zero consideration to his sham limited partnership." Thus, "[c]ommencing April 1, 2008, until her death in July 2009, basically Olive (and the Survivor's Trust) received no rental income. This is egregious and in bad faith."

The court ruled Duffy's bad faith conduct prevented Olive (and thus the Survivor's Trust) from recovering her 49 percent share of rents from April 2008 to July 2009, specifically $298,119. However, the court also found Duffy was entitled to offset the $280,000 down payment he made to acquire the Survivor's Trust ownership, leaving a difference of $18,119. The statutory penalty for Duffy's bad faith against the Survivor's Trust was therefore double the difference—$36,238.

Duffy does not contest the finding that his misconduct constituted bad faith. Rather, his argument is addressed to the court's calculation of the penalty, going so far as to say he does not owe anything to the Survivor's Trust.

Duffy first claims that the trial court should have valued the Bypass Trust's 15.77 percent ownership interest based on what it would have sold for at the time of Olive's death, rather than its appraised value; that such interest would have sold for far less than its appraised value because the interest was fractional; and that the "value" of this property interest he

35

converted—i.e., the amount that should be doubled under Probate Code section 859—should be less.

The trial court's valuation was fully supported. It found that evidence showing the fractional value of the Offield Building was generated to assess tax consequences of selling that Building. These fractional values were "artificially lower" because the leases of building spaces were below market rates due to Duffy's mismanagement and the prohibition against selling any interest in the building outside the family. In short, the fractional value was a way to allow Duffy to purchase his interests in the Offield Building for "less than fair market value."

According to the trial court, the better approach to assess the penalty was to examine the appraised value at Olive's death, at which point the Bypass Trust's interest would be distributed to the four Offield children without regard to the tax consequences of a sale or related discounts for fractional values. This decision reflects a reasoned attempt to calculate the Offield Building's value based on what would likely have happened when Olive died, which was simply a testamentary distribution to the Offield children. In sum, apart from arguing for the method he wanted, Duffy never explains why the trial court's method was wrong.

Duffy also contends the trial court should have reduced its valuation by the amount of unpaid principal on his promissory note. But Duffy did not raise this argument below, and we consider it waived. (*Doers v. Golden Gate Bridge, Highway and Transportation District* (1979) 23 Cal.3d 180, 184, fn. 1.) It also has no merit.

To award the penalty under Probate Code section 859, the trial court needed to value the Offield Building and the Bypass Trust's interest. Duffy received a credit for his down payment on the purchase of that interest,

because the down payment came out of his pocket and added value to the property. But the unpaid balance of the promissory note—i.e., the remaining amount of Duffy's debt accrued after his down payment—has no bearing on the value of what Duffy took as far as Probate Code section 859 is concerned. Again, Duffy does not explain why the amount he financed should lower the value of the Bypass Trust's interest, particularly since he borrowed the money from Olive. His only "explanation" is to say "[t]he value of the promissory note should have been offset." That is insufficient.[14]

Finally on this issue, Duffy claims the trial court also should have credited payments he made on the note before appointment of the interim trustee. But the appraised value of the property remains the same regardless of whether Duffy made note payments. Furthermore, the court found that before the appointment of the interim trustee, Duffy used the money from Olive to meet his monthly payment obligations on the notes and thus forfeited any credit resulting from those payments. The trial court's refusal to credit Duffy for pre-interim trustee loan payments ensured that he did not profit from his misdeeds.

---

[14] Duffy also asserts that the note's unpaid balance of the note is not in the record and asks us to calculate that amount based on a formula he obtained from www.wikihow.com. We decline the invitation. (See *Bombardier Recreation Prods. Inc. v. Dow Chem. Can. ULC* (2013) 216 Cal.App.4th 591, 605 [appellate courts make factual findings only in "exceptional circumstances"].) Indeed, our declination is particularly apt here, where Duffy had the chance to obtain the finding from the trial court but failed to do so. (See *ibid.* [refusing to engage in fact-finding where requesting party "failed to bring the facts to the trial court's attention in the first instance"].)

**Refusing Code of Civil Procedure Section 877 Credits to Duffy Was Not Error**

Code of Civil Procedure section 877 provides in pertinent part as follows:  "Where a release, dismissal with or without prejudice, or a covenant not to sue or not to enforce judgment is *given in good faith* before verdict or judgment to one or more of a number of tortfeasors *claimed to be liable for the same tort, or to one or more other co-obligors* mutually subject to contribution rights, it shall have the following effect:

"(a) It shall not discharge any other such party from liability unless its terms so provide, *but it shall reduce the claims* against the others in the amount stipulated by the release, the dismissal or the covenant, or in the amount of the consideration paid for it, whichever is the greater. . . ."  (Italics added.)

Duffy's last argument is that the trial court erred in refusing to credit him for the $2+ million settlement payment by Carr McClellan.

Duffy asserts we review the decision de novo, citing to *Wade v. Schrader* (2008) 168 Cal.App.4th 1039, 1044 (*Schrader*).  But as *Schrader* itself acknowledges—indeed, on that very page—"[w]e generally review a ruling granting or denying a [Code of Civil Procedure] section 877 settlement credit under the deferential abuse of discretion standard."[15]  Again, Duffy has shown no abuse.

The trial court decided against Duffy on this issue partly because his claim for credit was "procedurally improper."  As it was.  The Carr McClellan settlement occurred in December 2012; trial testimony ended in October

---

[15] Going on to note that "[t]o the extent that we must decide whether the trial court's ruling was consistent with statutory requirements, we apply the independent standard of review.  [Citation.]"  (*Schrader, supra,* 168 Cal.App.4th at p. 1044.)

2013; and Duffy requested a statement of decision that did not raise the credit issue. In August 2015, the court issued its amended proposed statement of decision; Duffy objected to it, but did not raise the credit issue. The court issued its final statement of decision in 2018, after which the parties exchanged proposed judgments; Duffy's proposed judgment did not raise the credit issue. In fact, Duffy raised the credit issue for the first time in February 2019, in briefs discussing final judgment calculations—and even then, he did not provide the settlement agreement so the court could evaluate whether credit was appropriate. Given all that, the trial court did not abuse its discretion in ruling Duffy's setoff request was procedurally improper.

But not only was Duffy's request late, it would fail for other reasons, including that Duffy has not demonstrated the requirements of Code of Civil Procedure section 877: that the release was "given in good faith" to "one or more of a number of tortfeasors claimed to be liable for the same tort."

As noted, there was no good faith determination. And he and Carr McClellan were not "a number of tortfeasors claimed to be liable for the same tort." Among other things Duffy was found liable for financial elder abuse, based on the various, and numerous, instances of misconduct discussed above. Carr McClellan's involvement, on the other hand, was described this way in the papers seeking to hold it responsible: "The Attorney Respondents had an attorney-client relationship with Olive Offield but gave her misinformation about the effects of the estate plan they created and failed to disclose material information to her. Notwithstanding that they were her attorneys, the Attorney Respondents represented interests adverse to hers, failed to meet privately with her and instead accepted Duffy's statements about her testamentary intent and advised, encouraged and created a one-

39

sided transaction favoring Duffy and ignoring the stated intentions of their nonagenarian client."[16]

Finally there is the settlement itself, which compensated Nancy for a portion of the attorney's fees she incurred in the action, and the trial court awarded a non-duplicative additional portion.

## NANCY'S CROSS-APPEAL

### Upholding the Third Amendment Was Not Error

Nancy's cross-appeal has three arguments, the first two of which address the trial court's decision upholding the Third Amendment to the Survivor's Trust. The first argument is that the court erred in using the wrong legal standard. As Nancy's brief puts it, the trial court misconstrued "the law regarding undue influence in two ways. First, the court erroneously believed the standard for undue influence was the same as for testamentary capacity, and thus it erroneously boiled down its analysis of these two distinct issues to whether Olive was competent to execute the Third Amendment." Nancy's second argument is that the court erred in equating the mistake of fact issue with the "other distinct undue influence grounds for invalidating the Third Amendment." Neither argument is persuasive.

The Third Amendment was, the trial court concluded, "not the result of undue influence." This conclusion followed the trial court's lengthy discussion of how the Third Amendment came to be; a four-page exposition of the law of testamentary capacity; and the court's finding that Olive had testamentary capacity at the time she executed the Third Amendment. The

---

[16] *Oliveira v. Kiesler* (2012) 206 Cal.App.4th 1349, the case cited by Duffy as having facts "almost identical" to this case, is distinguishable. As Duffy's own discussion of the case reveals, after the wrongdoing plan was hatched, one of the wrongdoing stepsons hired "the Attorney Defendants to further his plan." That is not the situation here.

40

conclusion that the Third Amendment was not the result of undue influence was followed by this discussion:

"As set forth above, the Court finds that the evidence demonstrates that Olive knowingly made the decision—even though done at the suggestion of Duffy—to give her existing ownership interest, via the Survivor's Trust, in the Offield Building to Duffy *for distribution after her death.* She was willing to accommodate the desire of her son to have all of his share of the anticipated estate distribution be in one asset, rather than [one-quarter] of all the various assets. This general concept had been discussed between Olive, Duffy and Martha for years prior to the Third Amendment. Further, Olive was willing to give Duffy a 'leg up' to effectuate a plan for Duffy to buy out his sisters as to their interests in the Offield Building that they would inherit through the Bypass Trust—all to occur after Olive's death."

The trial court went on to cite evidence in support of the above, including testimony from caregiver Edith Mena, who testified that Olive told her, "I am leaving the building to Duffy because he always takes care of it," the court expressly noting the "future tense" of the statement. The trial court also cited at length the testimony of Carr McClellan attorney Laurelle Gutierrez, who met with Olive "*alone* on December 20, 2007" to sign the Third Amendment. Ms. Gutierrez and Olive discussed that the Offield Building would go to Duffy, and that if he were to die it would then go to his children. They discussed the changes made to the Trust and Will, and Olive told Ms. Gutierrez she was concerned about the possibility of a challenge by an unhappy beneficiary. Ms. Gutierrez assured Olive there was now a "lengthy 'no contest' clause," and Olive seemed more at ease. They then discussed the downtown Burlingame improvements being made by the City,

41

and Olive said that she wanted the Offield Building to go to Duffy, and she knew he would be sure the bakery would stay as a tenant.

The trial court then summed up: "Olive and Gutierrez specifically discussed that the Offield Building would go to Duffy upon her death, and the three daughters would receive all of the stock/investments and the Offield Residence. Gutierrez told Olive that the assets might change in value over time, prior to her death, so the division of the assets might be unequal between her son and her daughters upon Olive's death. Olive acknowledged that there would be an unequal distribution under the Third Amendment. Olive signed the Third Amendment and the new Will with the notary present."

Following all that, the trial court made two other observations:

(1) "To the extent that the Petition also contested the Third Amendment on the grounds of 'mistake' of understanding by Olive, that basis is also rejected on the same factual grounds";

(2) "The Court finds that Nancy did not prove, by clear and convincing evidence, undue influence as to the Third Amendment or the 2007 Will. Alternatively, regardless of who had the burden of proof on this issue, the conclusion by the Court would be the same, as the preponderance of the evidence shows that Olive knew and understood the nature and substance of the change in post-death distribution she was effectuating by the Third Amendment and the 2007 Will."

Nancy's first argument asserts, as her brief puts it, the "court erroneously believed the standard for undue influence was the same as for testamentary capacity." Nancy does not contend there is no substantial evidence supporting the court's finding that Olive "knew and understood her actions" with respect to the issue of testamentary capacity. Nancy also

acknowledges this finding "bears on the undue influence analysis," but argues it does not mean no undue influence occurred, asserting rather the court's decision should be reversed because it failed to adequately consider other "indicia" of undue influence that she claims were present. Little need be said about this claim, other than that is what fact-finders do: accept some evidence and reject other evidence.

To the extent Nancy argues that the trial court had to shift the burden to Duffy to overcome the presumption of undue influence, a complete answer is found in the trial court's holding that there was no inequity or undue benefit that would support a presumption of undue influence. (See *Estate of Stephens, supra*, 28 Cal.4th at p. 678, citing *Camperi v. Chiechi* (1955) 134 Cal.App.2d 485, 505.)[17]

Finally, if there was error, it was harmless, as the trial court expressly stated, noting that its decision would be the same "regardless of who had the burden of proof."

---

[17] The court added these two paragraphs: "The concept reflected in the Third Amendment is that upon Olive's death, Duffy would receive the Offield Building, even if it was more than [one-quarter] share of the estate, and the three daughters would receive the house (or proceeds of the house) and all of the investments. In this fashion, Duffy would have no rights to the other assets in the Survivor's Trust (although he would have rights to other assets through the Bypass Trust) and instead shift his distribution to be the Offield Building.

"Although not 100 [percent] equal between the four siblings, at the time back in December 2007, the value of the assets was not overly unbalanced between the value of the Offield Building versus the value of the Offield residence, the cash and investments, and the anticipated income from the rent of the Offield Building (which would potentially increase the amount of cash and investments.)"

Nancy's second, and related, argument is that the court erred by failing to adequately consider her "mistake of fact" claim or to consider it separately from the undue influence claim. Nancy contends that "Olive signed the Third Amendment because she erroneously *believed* Nancy would (1) file a partition action and bring a stranger into the Offield Building ownership, and (2) raise rents thus forcing Copenhagen Bakery out," and that signing the Third Amendment would prevent these things from happening. She contends "the court erroneously rejected [her] mistake of fact claim based on its finding that Olive understood the Third Amendment would give Duffy control over the Offield Building upon her death."

Although the court's discussion of the "mistake of fact" issue is not as extensive as its discussion of the undue influence issue, it is clear that the court considered them separately. As quoted above, following a detailed discussion of the reasons for, and evidence supporting, its conclusion that the Third Amendment was not the result of undue influence, the court expressly concluded that: "To the extent that the Petition also contested the Third Amendment on the grounds of 'mistake' of understanding by Olive, that basis is also rejected on the same factual grounds."

**Exonerating Martha Was Not Error**

Nancy's last argument is that the trial court erred in exonerating Martha, a brief argument we easily reject.

We begin with the observation that the argument is based on a recitation of the record that is in disregard of settled principles of appellate review, ignoring the rule that the evidence must be viewed most favorably to Martha, the prevailing party, and in support of the judgment. (*Crawford v. Southern Pacific Co.* (1935) 3 Cal.2d 427, 429.) As another leading case would put it, " 'It is well established that a reviewing court starts with the

presumption that the record contains evidence to sustain every finding of fact.' . . . A recitation of only defendants' evidence is not the 'demonstration' contemplated under the above rule. . . . Accordingly, if, as defendants here contend, 'some particular issue of fact is not sustained, they are required to set forth in their brief *all* the material evidence on the point and *not merely their own evidence*. Unless this is done the error is deemed to be waived.' " (*Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 881, citations omitted.) Nancy's argument can be deemed waived.

It also has no merit. In exonerating Martha, the trial court set forth its reasons in detail, including with these three paragraphs:

"As to any and all claims asserted against Defendant Martha Jane Zarcone, the Court finds in favor of Martha Jane Zarcone and against Petitioner. Petitioner Nancy failed to prove her claims against Respondent Martha by a preponderance of the evidence. The substantive evidence overwhelmingly reflects that there was no scienter on the part of Martha, there was no undue influence by Martha, there were no operative acts of [*sic*] lies to or concealment from Olive by Martha. She did what she thought was best for Olive, or proceeded with what she believed, in good faith, to be the wishes of her mother—Martha acted with a good heart.

"Martha achieved no benefit for herself, and did not wrongfully take or transfer any assets of Olive to herself . . . . Martha did not engage in 'breach of trust' as she was not the Trustee at the time of these transactions, nor did she assert control over the assets of the Trusts or of Olive at the time, and thus did not purport to conduct herself as a de facto Trustee. . . .

"The allegations that Martha did not fully explain to or did actively conceal[] from Olive the financial and economic ramifications of the division of the trust property by fractional interests, and the valuation of

45

fractionalized property interests by use of discount rates, do not raise any liability as to Martha. . . . The evidence reflects that Martha didn't have any independent understanding of any of those concepts. Instead she was relying upon the advice of Olive's attorney, who himself suggested and thereafter implemented these convoluted transactions, which were designed to address tax implications."

There was no evidence that Martha wrongfully took, transferred, or received any assets that belonged to Olive. And no evidence that Martha benefited in any way from the Third Amendment or from the sale of fractional interests in the Offield Building to Duffy. As quoted, the trial court described that the evidence "overwhelmingly reflects" in Martha's favor, who acted with a "good heart" in a "good faith" belief in her "mother's wishes." Nancy has demonstrated nothing to the contrary.

On this issue, we close with the observation that the trial court held that "Nancy failed to prove her claims." Such conclusion creates a heavy, if not insurmountable, burden on Nancy here, as set forth, for example in *Sonic Manufacturing Technologies, Inc. v. AAE Systems, Inc.* (2011) 196 Cal.App.4th 456, 466: " '[W]here the issue on appeal turns on a failure of proof at trial, the question for a reviewing court becomes whether the evidence compels a finding in favor of the appellant as a matter of law. [Citations.] Specifically, the question becomes whether the appellant's evidence was (1) "uncontradicted and unimpeached" and (2) "of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding." ' (*In re I.W.* (2009) 180 Cal.App.4th 1517, 1527–1528[, disapproved on other grounds in *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1010, fn. 7].)" (Accord, *Los Angeles County Dept. of Children & Family Services v. Superior Court* (2013) 215 Cal.App.4th 962,

967; *Fabian v. Renovate America, Inc.* (2019) 42 Cal.App.5th 1062, 1067 [" ' "[w]here, as here, the judgment is against the party who has the burden of proof, it is almost impossible for him to prevail on appeal by arguing the evidence compels a judgment in his favor" ' "].)

Nancy has not even attempted to make such demonstration.[18]

## DISPOSITION

The judgment is affirmed. The parties are to bear their respective costs on appeal.

---

[18] Nancy asserts that she may be entitled to additional attorney fees, an argument necessarily dependent on her having some success on her cross-appeal, which she has not.

_____
Richman, Acting P. J.

We concur:


_____
Miller, J.


_____
Mayfield, J. *


*Nelson v. Offield* (A160134)

     *Superior Court of Mendocino County, Judge Cindee Mayfield, sitting as assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.